EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Javier Torres Cruz<br><br>Recurrido | Certiorari<br><br>2015 TSPR 147<br><br>194 DPR ____ |

Número del Caso: CC-2015-836

Fecha: 4 de noviembre de 2015

Tribunal de Apelaciones:

      Región Judicial de Guayama

Oficina de la Procuradora General:

      Lcda. Margarita Mercado Echegaray
      Procuradora General

      Lcda. Yazmet Y. Ramírez Díaz
      Procuradora General Auxiliar

Abogada de la Parte Recurrida:

      Por derecho propio

Materia: Derecho Penal – Principio de favorabilidad en cuanto a la pena; aplicación en Sentencias dictadas tras una alegación pre-acordada.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico                              *Certiorari*

    Peticionario

       v.
                           CC-2015-0836
Javier Torres Cruz

    Recurrido


Opinión del Tribunal emitida por el Juez Asociado señor RIVERA GARCÍA.


En San Juan, Puerto Rico, a 4 de noviembre de 2015.

Este caso nos brinda la oportunidad de expresarnos sobre la aplicación del principio de favorabilidad que regula el Art. 4 del Código Penal de 2012, 33 LPRA sec. 5004, en cuanto a las enmiendas introducidas por la Ley Núm. 246-2014 a ese cuerpo reglamentario. Como es ampliamente conocido, la Ley Núm. 246, íd., enmendó varios delitos del Código Penal de 2012 con el propósito de reducir sus respectivas penas. Un análisis riguroso del historial legislativo de esa legislación revela que la Asamblea Legislativa no limitó la aplicación del principio de favorabilidad a casos como el de autos en que la sentencia condenatoria es producto de

una alegación preacordada al amparo de la Regla 72 de Procedimiento Criminal, 34 LPRA Ap. II. Asimismo, es necesario discutir el alcance de la teoría contractual que esgrime la Procuradora General como impedimento para la aplicación del principio de favorabilidad en casos en que existe una alegación preacordada. Por los fundamentos que se explican a continuación, se confirma la Sentencia del Tribunal de Apelaciones que concluyó que procedía aplicar el principio de favorabilidad en este caso.

I

Contra el Sr. Javier Torres Cruz pesa una sentencia condenatoria emitida el 4 de febrero de 2013, en la que se impuso un término de reclusión de cuatro años por el delito de escalamiento, Art. 194 del Código Penal de 2012, 33 LPRA sec. 5265, y seis meses por el delito de daños, Art. 198 del Código Penal de 2012, 33 LPRA sec. 5268, a cumplirse concurrentemente.

Con posterioridad a la aprobación de la Ley Núm. 246, _supra_, el señor Torres Cruz presentó por derecho propio un escrito ante el Foro Primario en que argumentó que procedía corregir la sentencia condenatoria. Para justificar esa conclusión, expresó que la Ley Núm. 246, _íd._, había reducido la pena para el delito de escalamiento a seis meses. Véase Art. 194 del Código Penal de 2012, _supra_, según enmendado por el Art. 115 de la Ley Núm. 246-2014. El Tribunal de Primera Instancia emitió una

Sentencia el 27 de mayo de 2015 mediante la cual denegó la solicitud del señor Torres Cruz.

Inconforme, el señor Torres Cruz compareció ante el Tribunal de Apelaciones. El 28 de septiembre de 2015, ese Foro emitió una Sentencia en la cual concluyó que procedía la aplicación del principio de favorabilidad que regula el Art. 4 del Código Penal de 2012, supra, en lo que respecta a las enmiendas introducidas por la Ley Núm. 246-2014 a ese cuerpo reglamentario. En particular, concluyó el Foro Apelativo Intermedio que procedía modificar la Sentencia condenatoria que pesaba contra el recurrido ya que la Ley Núm. 246, íd., redujo la pena de reclusión del delito de escalamiento, Art. 194 del Código Penal, supra, de cuatro años a seis meses. Cónsono con lo anterior, se ordenó al Pueblo de Puerto Rico que certificara al Foro Primario en cinco días el tiempo de reclusión cumplido por el recurrido al 28 de septiembre de 2015. De esa forma, si excedía de seis meses, procedía la excarcelación del recurrido.

En desacuerdo, el 5 de octubre de 2015, la Procuradora General acudió ante este Tribunal mediante *Petición de Certiorari* y *Moción en Auxilio de Jurisdicción* en la que adujo que procedía revocar la determinación del Tribunal de Apelaciones ya que, a su modo de ver las cosas, no aplica a este caso el principio de favorabilidad. El 6 de octubre de 2015, este Foro emitió una Resolución en que concedió un término simultáneo de 15 días a las partes

para que se expresaran sobre los méritos de la Petición de *Certiorari*. Además, en la aludida Resolución, declaramos sin lugar la moción en auxilio de jurisdicción y ordenamos a la Oficina de la Procuradora General que presentara una certificación del tiempo en reclusión cumplido por el señor Torres Cruz.

El 9 de octubre de 2015, la Procuradora General nos certificó que el recurrido ha cumplido dos años, siete meses y veintidós días de reclusión. Entrada la tarde del mismo 9 de octubre de 2015, este Tribunal expidió el auto de certiorari y ordenó incondicionalmente la excarcelación del recurrido.[1]

Ante la importancia que reviste este caso, prescindimos de los términos reglamentarios habituales conforme lo permite la Regla 50 de nuestro Reglamento, 4 LPRA Ap. XXI-B.

II

Nuestro Ordenamiento Jurídico provee herramientas a una persona que hizo una alegación de culpabilidad para que impugne su convicción colateralmente, por medio de procedimientos posteriores a la sentencia, tales como la moción bajo la Regla 192.1 de Procedimiento Criminal, 34 LPRA Ap. II, o el recurso de hábeas corpus. Pueblo v. Román Mártir, 169 DPR 809, 822 (2007). Es decir, la Regla 192.1 de Procedimiento Criminal, supra, permite que

---

[1] La Jueza Asociada señora Pabón Charneco no intervino y el Juez Asociado suscribiente hubiese declarado sin lugar la excarcelación incondicional del recurrido.

cualquier persona que se halle detenida luego de recaída una sentencia condenatoria, a presentar en cualquier momento una moción en la sede del TPI que dictó el fallo condenatorio, con el objetivo de que su convicción sea anulada, dejada sin efecto o corregida, en circunstancias en que se alegue el derecho a ser puesto en libertad por cualquiera de los siguientes fundamentos:

La sentencia fue impuesta en violación de la Constitución o las leyes del Estado Libre Asociado de Puerto Rico o la Constitución y las leyes de Estados Unidos; o

el tribunal no tenía jurisdicción para imponer dicha sentencia; o,

la sentencia impuesta excede de la pena prescrita por la ley; o

la sentencia está sujeta a ataque colateral por cualquier motivo [...]. 34 LPRA Ap. II.

En este caso, el recurrido aduce que procede enmendar la Sentencia por virtud de la aplicación del principio de favorabilidad que se encuentra regulado por el Art. 4 del Código Penal de 2012, supra. Por esa razón, pasamos a discutir con rigor dicho principio.

En armonía con la doctrina continental europea, al derogar el Código Penal que regía desde el 1902, adoptamos en Puerto Rico el "principio de favorabilidad", que quedó consagrado en el Artículo 4 del Código Penal de 1974, 33 L.P.R.A ant. sec. 3004. Pueblo v. González, 165 DPR 675, 684 (2005). Posteriormente, el Art. 9 del Código Penal de 2004, 33 LPRA ant. sec. 4637, introdujo una disposición de más amplio alcance en cuanto al principio de

favorabilidad. Dicho principio se encuentra regulado actualmente por el Art. 4 del Código Penal de 2012, _supra_, el cual dispone, en lo pertinente, que:

La ley penal aplicable es la vigente al momento de la comisión de los hechos.

La ley penal tiene efecto retroactivo en lo que favorezca a la persona imputada de delito. En consecuencia, se aplican las siguientes normas:

(a) Si la ley vigente al tiempo de cometerse el delito es distinta de la que exista al procesar al imputado o al imponerle la sentencia, se aplicará siempre la ley más benigna.

**(b) Si durante el término en que la persona está cumpliendo la sentencia entra en vigor una ley más benigna en cuanto a la pena o al modo de ejecutarla, se aplicará retroactivamente.**

(c) Si durante el término en que la persona está cumpliendo la sentencia entra en vigor una ley que suprime el delito, o el Tribunal Supremo emite una decisión que despenalice el hecho, la pena quedará extinguida y la persona liberada, de estar recluida o en restricción de libertad.

En estos casos los efectos de la nueva ley o de la decisión judicial operarán de pleno derecho. (Énfasis suplido.)

Conforme al principio de favorabilidad, procede la aplicación retroactiva de una ley penal cuando favorece a la persona imputada de delito. _Pueblo v. Hernández García_, 186 DPR 656, 673 (2012). Comenta el Prof. L.E. Chiesa Aponte que ese principio tiene como propósito evitar la aplicación arbitraria e irracional de la ley penal ya que "el principio republicano de gobierno exige la racionalidad de la acción del estado y esta es afectada cuando, por la mera circunstancia de que un individuo haya cometido el mismo hecho con anterioridad a otro, se l[e]

trate más rigurosamente". Chiesa Aponte, Derecho Penal Sustantivo, 2da ed., Estados Unidos, Publicaciones JTS, 2013, pág. 59 , citando a E. R. Zaffaroni, Derecho Penal, Parte General, 2da ed., Ediar, 2002, pág. 122.

No obstante, a diferencia de la prohibición constitucional de leyes ex post facto que contiene el Art. II, Sec. 12 de la Constitución de Puerto Rico, LPRA Tomo I, el principio de favorabilidad corresponde a un acto de gracia legislativa cuyo origen es puramente estatutario. Pueblo v. González, supra, pág. 686. De esa manera, corresponde a la Asamblea Legislativa establecer y delimitar el rango de aplicación del principio de favorabilidad. Íd.

Por otra parte, la Prof. Dora Nevarez Muñiz comenta que el principio de favorabilidad incluido en el Art. 4 del Código Penal de 2012, supra, "aplicará a conducta delictiva realizada a partir del 1 de septiembre de 2012 **cuando se apruebe una ley que sea más favorable que el Código Penal según vigente al momento de aprobación de la ley posterior con respecto a la situación de la persona".** D. Nevares-Muñiz, Derecho Penal Puertorriqueño, 7ma ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 102.

Conforme al texto del Art. 4 del Código Penal vigente, supra, la ley favorable puede surgir mientras se está procesando al imputado, al momento de imponerle la sentencia o durante el término en que se cumple. Art. 4

del Código Penal, supra; L.E. Chiesa Aponte, Derecho Penal Sustantivo, op cit., pág. 66. Asimismo, los cambios que se aplicarán retroactivamente pueden ser en cuanto a la tipificación del delito, sus atenuantes, las causas de exclusión de responsabilidad, los requisitos de prueba, las penas, así como disposiciones procesales. D. Nevares-Muñiz, Código Penal de Puerto Rico, Código Penal de Puerto Rico, 3ra ed. rev., San Juan, Instituto para el Desarrollo del Derecho, Inc., 2015, pág. 10.

La fórmula para determinar cuál es la ley más favorable consiste en comparar las dos leyes, la ley vigente al momento de cometer el delito con la ley nueva, y aplicar aquella que en el caso objeto de consideración arroje un resultado más favorable para la persona. D. Nevares Muñiz, Derecho Penal Puertorriqueño, op cit., pág. 94.

Ahora bien, mediante la incorporación de las cláusulas de reserva en los códigos penales se ha advertido la intención del legislador de imponer limitaciones al principio de favorabilidad. Pueblo v. González, supra, págs. 698-699; D. Nevares-Muñiz, Derecho Penal Puertorriqueño, op cit., pág. 102. Las cláusulas de reserva fueron empleadas en el derecho penal norteamericano, desde el Siglo XIX, con el propósito de neutralizar la conocida doctrina de supresión y de esa forma garantizar la continuidad en el procesamiento

criminal.[2] <u>Pueblo v. González</u>, <u>supra</u>, pág. 687; A. Bascuñán Rodríguez, <u>La Aplicación de la Ley Penal Más Favorable</u>, 69 Rev Jur. U.P.R. 29, 55 (2000).

De esa forma, "por medio de cláusulas de reserva generales aplicables a todas las leyes penales derogadas, enmendadas o reinstaladas, se estableció que al aprobar una nueva ley penal la intención legislativa no es suprimir los procedimientos iniciados —y que aun no hubiesen advenido finales— sino la no supresión de éstos a menos que la Legislatura lo dispusiera así expresamente". <u>Pueblo v. González</u>, supra, pág. 686. Véase, también, Comentario, <u>Today's Law and Yesterday's Crime: Retroactive Application of Ameliorative Criminal Legislation</u>, 121 U. Pa. L.Rev. 120, 127 (1972).

Cabe mencionar que la legislación que nos ocupa, la Ley Núm. 246-2014, **<u>no</u>** contiene una cláusula de reserva que prohíba su aplicación retroactiva. Nevares-Muñiz, Derecho Penal Puertorriqueño, <u>op. cit.</u>, pág. 102. Surge de su historial que la Asamblea Legislativa tuvo la intención de "disponer penas rehabilitadoras en delitos menos graves y en delitos graves de severidad intermedia; además de

---

[2] En <u>Pueblo v. González</u>, <u>supra</u>, págs. 686-687, explicamos la doctrina de supresión de la siguiente manera:

Según la doctrina de la supresión del *common law*, seguida originalmente por los tribunales norteamericanos, la derogación de una ley penal resultaba en la supresión de todos los procedimientos que aun no fuesen finales. Conforme a la mencionada doctrina, se interpretaba que cuando el legislador aprobaba un estatuto que derogaba o modificaba un estatuto penal anterior, tenía la intención de impedir la aplicación judicial del estatuto derogado o modificado.

disponer para el ejercicio de la discreción judicial mediante criterios que orienten al ejercerla". <u>Íd</u>. A continuación analizamos en detalle el historial legislativo de la Ley Núm. 246-2014.

El P. del S. 1210 de 7 de octubre de 2014, fue el proyecto original del Senado de Puerto Rico que recogió las enmiendas al Código Penal de 2014. El Art. 189 del P. del S. 1210 titulado "Vigencia" disponía:

Esta Ley comenzará a regir inmediatamente después de su aprobación. La conducta realizada con anterioridad a la vigencia de esta Ley, se juzgará conforme a las disposiciones del Código Penal existente previo a la entrada en vigor de esta Ley, **salvo que las penas más benignas introducidas mediante esta Ley se aplicarán retroactivamente a hechos ocurridos a partir de la entrada en vigor de este Código.** (Énfasis suplido).

Eventualmente, este artículo fue reconfigurado durante su trámite y pasó a ser el Art. 185 de la Ley Núm. 246-2014, y se aprobó con el siguiente lenguaje: "*Esta Ley comenzará a regir noventa días después de su aprobación*". Obsérvese que la primera redacción del texto propuesto contiene una cláusula de reserva y una manifestación expresa sobre la aplicación del principio de favorabilidad en lo pertinente a las penas. Sin embargo, el lenguaje finalmente aprobado no contiene una cláusula de reserva, por lo que el principio de favorabilidad opera de pleno derecho. Esa es la interpretación más razonable si se tiene en cuenta el tracto y la intención de la pieza legislativa.

De la propia Exposición de Motivos de la Ley Núm. 246-2014 surge de forma manifiesta que esa legislación

tiene como propósito, entre otros, la implementación de "un sistema de penas proporcionales a la gravedad de los delitos, que a su vez propiciarán la rehabilitación de la persona sentenciada". Véase el Informe Positivo sobre el P. del S. 1210, suscrito por la Comisión Conjunta para la Revisión del Código Penal y para la Reforma de las Leyes Penales de 12 de noviembre de 2014. (Informe de la Comisión Conjunta).

De igual manera, un análisis exhaustivo de las personas que presentaron su ponencia ante la Asamblea Legislativa sobre el P. del S. 1210 refleja que la intención legislativa en todo momento fue reducir las penas de los delitos. El Prof. Luis Ernesto Chiesa Aponte, asesor de la Comisión Conjunta, expresó que el esquema de penas de Puerto Rico es injustificado por lo que apoyó la reducción en las penas. Informe de la Comisión Conjunta, pág. 6. Por su parte, la Prof. Dora Nevares Muñiz explicó en su ponencia que los cambios que se realizaron en los términos de reclusión están orientados a mantener la proporcionalidad de las penas conforme la gravedad de los delitos a lo largo de una dimensión de reprochabilidad. *Ponencia de la Dra. Dora Nevares Muñiz de 27 de octubre de 2014.*

Por otra parte, el Prof. Ernesto Luis Chiesa Aponte recomendó en su ponencia que debía regularse expresamente bajo el propuesto Artículo 303 del Código Penal el efecto retroactivo de las enmiendas bajo consideración en la

medida que favorezcan al imputado. *Ponencia del Prof. Ernesto L. Chiesa Aponte de 29 de octubre de 2014.*

Por su parte, el Secretario de Justicia, Hon. César Miranda Torres, expresó que el paquete de enmiendas al Código Penal de 2012 tenía como propósito reducir las penas para que redunde "en un incentivo para la rehabilitación del convicto". *Ponencia del Lcdo. César Miranda Torres de 30 de octubre de 2014*, pág. 3. No obstante, el Secretario de Justicia se opuso a las reducciones sustanciales de las penas en los delitos de agresión sexual (Artículo 130, 33 LPRA sec. 5191), incesto (Artículo 131, 33 LPRA sec. 5192), secuestro de menores (Artículo 120 33 LPRA sec. 5179), el Artículo 190 en la modalidad de robo domiciliario, 33 LPRA sec. 5260 y el Artículo 121 sobre privación ilegal de custodia, 33 LPRA sec. 5180, ya que tienen un impacto social muy serio. Ahora bien, no surge de la ponencia que el Secretario de Justicia se opusiera a la disminución de la pena en cuanto al delito de escalamiento, Art. 194 del Código Penal, supra, objeto de controversia en este caso.

En fin, se desprende claramente del historial legislativo que la intención de la Asamblea Legislativa al aprobar la Ley Núm. 246-2014 fue reducir las penas de varios delitos regulados por el Código Penal de 2012 y que dicha reducción aplicara a casos de personas ya convictas. Por esa razón, la Ley Núm. 246-2014 no contiene una cláusula de reserva que impida la aplicación del principio

de favorabilidad que establece el Art. 4 del Código Penal, supra.[3]

III

La Procuradora General en su Alegato se limita a expresar que en este caso no procede aplicar el principio de favorabilidad porque la sentencia condenatoria es producto de una alegación preacordada. Es decir, la Procuradora General sostiene que las personas que resultaron convictas luego de que se celebrara un juicio criminal pueden invocar el principio de favorabilidad en lo que respecta a la Ley Núm. 246-2014, mientras que las personas convictas mediante una alegación preacordada no pueden invocar el referido principio ya que "se obligaron contractualmente" a cumplir una pena en particular. Por los fundamentos que se elaboran a continuación, es forzoso concluir que a la Procuradora General no le asiste la razón. Tanto las personas que resultaron convictas luego de la celebración de un juicio plenario como las que realizaron una alegación de culpabilidad preacordada pueden invocar el principio de favorabilidad.

---

[3] Precisa aclarar que la cláusula de reserva que contiene el Art. 303 del Código Penal de 2012, 33 LPRA sec. 5412, no tiene el alcance de impedir que aplique en este caso el principio de favorabilidad. Dicha cláusula de reserva lo que prohíbe es que se utilicen las disposiciones del Código Penal de 2012 para juzgar la conducta cometida mientras estuvo vigente el Código Penal de 2004. Véase, en general, Pueblo v. Negrón Rivera, 183 DPR 271 (2011), Voto de Conformidad emitido por el Juez Asociado señor Martínez Torres y Voto Particular de Conformidad emitido por el Juez Asociado señor Rivera García al que se unió la Jueza Asociada señora Pabón Charneco.

En Puerto Rico, el procedimiento para reglamentar el sistema de alegaciones preacordadas fue originalmente adoptado por esta Curia en Pueblo v. Mojica Cruz, 115 DPR 569 (1984). Pueblo v. Pérez Adorno, 178 DPR 946, 956 (2010). Con posterioridad, la Legislatura aprobó la Regla 72 de Procedimiento Criminal, 34 LPRA Ap. II, en la cual incorporó el sistema de alegaciones preacordadas adoptado en Pueblo v. Mojica Cruz, supra. Pueblo v. Santiago Agricourt, 147 DPR 179, 192 (1998). La Regla 72 de Procedimiento Criminal, supra, codifica los requisitos que se tienen que cumplir al realizar la alegación preacordada, de manera que ésta pueda dar base a una sentencia condenatoria. Pueblo v. Pérez Adorno, supra, pág. 957.

En particular, la referida regla concede al Tribunal de Primera Instancia la discreción para aprobar la alegación preacordada a la que haya llegado el Ministerio Público y la representación legal del imputado de delito. Pueblo v. Acosta Pérez, 190 DPR 823, 830 (2014). Dicha determinación se debe realizar mediante una evaluación de si: (1) la alegación fue hecha con pleno conocimiento, conformidad y voluntariedad del imputado; (2) ésta es conveniente a una sana administración de la justicia, y (3) se logró conforme a derecho y a la ética. Pueblo v. Pérez Adorno, supra, pág. 957. Si el acuerdo no satisface dichos requisitos, entonces el Tribunal tiene que rechazarlo. Asimismo, el Tribunal debe asegurarse de que

existe una base suficiente en los hechos para sostener que el acusado resultaría culpable más allá de duda razonable en caso de llevarse a cabo un juicio. Pueblo v. Suárez, 163 DPR 460, 471 (2004).

Al hacer una alegación de culpabilidad, el acusado no sólo afirma haber realizado los actos descritos en la denuncia o acusación, sino que además acepta y admite que es el culpable del delito objeto de su alegación. La aceptación de la alegación constituye una convicción con carácter concluyente que no le deja al tribunal más que hacer que no sea emitir el fallo y la sentencia. Véanse, Pueblo v. Acosta Pérez, supra, págs. 833-834; Pueblo v. Pérez Adorno, supra, pág. 960.

En esencia, las alegaciones preacordadas son de gran valor para nuestro sistema de justicia criminal, ya que permiten conceder ciertos beneficios al acusado si éste se declara culpable, descongestionan los calendarios de los tribunales y propician que se enjuicien a los acusados dentro de los términos de rápido enjuiciamiento. Pueblo v. Acosta Pérez, supra, pág. 834; Pueblo v. Santiago Agricourt, supra, pág. 194.

Ahora bien, precisa puntualizar que en nuestro Ordenamiento Jurídico no existe tal cosa como una **sentencia "acordada".** Es decir, aunque el Ministerio Público y el abogado de defensa lleguen a un acuerdo para realizar cierta alegación de culpabilidad, el Tribunal tiene discreción para no aceptar el acuerdo. Pueblo v.

Acosta Pérez, supra, pág. 830. Incluso, como el Tribunal está impedido de participar en las negociaciones entre el Ministerio Público y el abogado de defensa, la sentencia final que imponga el Juez está desvinculada de la negociación entre las partes. Es por ello que no podemos aceptar la analogía que intenta establecer la Procuradora General con el derecho contractual. Después de todo, las alegaciones preacordadas no son "ni un contrato tradicional entre el acusado y el Estado, como tampoco un precontrato de oferta u opción de alegación entre las partes donde alguna de ellas pueda exigir el cumplimiento específico en caso de incumplimiento". Pueblo v. Santiago Agricourt, supra, pág. 198.

Así pues, no es posible aquí hablar de que el señor Torres Cruz esté "incumpliendo" el acuerdo con el Ministerio Público al solicitar rebaja de sentencia, pues la sentencia no puede formar parte del acuerdo, al recaer ésta exclusivamente sobre el Tribunal. En efecto, aplicar aquí los principios del derecho contractual, a los fines de sustraer del ámbito judicial la imposición o corrección de una sentencia, violaría "la naturaleza del proceso penal". Véase, E.L. Chiesa Aponte, Tratado de Derecho Procesal Penal de Puerto Rico y Estados Unidos, 1992, Vol. III, Sec. 27.5, págs. 292-293; Pueblo v. Figueroa García, 129 DPR 798, 806-07 (1992).

Como se mencionó anteriormente, un condenado puede atacar colateralmente una sentencia, aunque sea producto

de un pre-acuerdo, al amparo de la Regla 192.1 de Procedimiento Criminal, supra. Pueblo v. Santiago Agricourt, supra, págs. 210-211. Esta Regla permite solicitar que se "corrija la sentencia", incluso en casos en que la sentencia impuesta "*excede de la pena prescrita por la ley*". Regla 192.1 de Procedimiento Criminal, supra.

A pesar de que la Procuradora General argumenta que un acusado, al hacer alegación de culpabilidad como parte de un preacuerdo, renuncia a invocar posteriormente el principio de favorabilidad para solicitar una rebaja en la sentencia impuesta, no se cita autoridad alguna que apoye esta contención, más allá de mencionar la teoría contractual antes descartada y citar cierta jurisprudencia federal inaplicable que trata sobre la renuncia de derechos constitucionales que realiza toda persona acusada que acepta una alegación preacordada. United States v. Ruiz, 536 U.S. 622 (2002); U.S. v. Broce, 488 U.S. 563 (1989); McMann v. Richardson, 397 U.S. 759 (1970); y Brady v. United States, 397 U.S. 742 (1970). Sobre la improcedencia de lo resuelto en esos casos, basta decir que el recurrido señor Torres Cruz no fundamentó su solicitud de enmienda en un planteamiento constitucional, sino en la aplicación de un principio de Derecho Penal Sustantivo que se encuentra regulado en el Art. 4 del Código Penal de 2012: el principio de favorabilidad.

En fin, la Procuradora General no nos ha señalado, ni hemos identificado a través de nuestra propia

investigación, autoridad alguna que sostenga la conclusión de que, por tratarse de un preacuerdo, el sentenciado señor Torres Cruz queda impedido de invocar el principio de favorabilidad en este caso donde la pena por el delito de escalamiento fue reducida de cuatro años a seis meses por virtud de la Ley Núm. 246-2014. De esa forma, actuó correctamente el Tribunal de Apelaciones al revocar el dictamen del Tribunal de Primera Instancia y atemperar la sentencia condenatoria que pesa en contra del señor Torres Cruz a lo dispuesto por la Ley Núm. 246-2014.

IV

El resultado al que arribamos en el día de hoy era perfectamente previsible para la Asamblea Legislativa y para el propio Departamento de Justicia que tuvo la oportunidad de deponer sobre la sabiduría del P. del S. 1210, eventual Ley Núm. 246-2014. Es decir, el momento que el Departamento de Justicia tuvo para oponerse a la aplicación del principio de favorabilidad en casos como este fue durante el trámite legislativo del P. del S. 1210, eventual Ley Núm. 246-2014. Era en ese momento que había que alertar a la Legislatura de las consecuencias que tendrían las enmiendas propuestas. Como señalamos, no surge del historial legislativo que el Secretario de Justicia se opusiera a la reducción de la pena del delito de escalamiento o que abogara por la inclusión de una cláusula de reserva que detuviera la aplicación del principio de favorabilidad. Al enmendarse el Código Penal

mediante esta Ley, no se dispuso que dichas enmiendas fueran inaplicables a los sentenciados con anterioridad. Sencillamente, aplica aquí el principio de favorabilidad por virtud del cual la Asamblea Legislativa siempre tendrá la potestad de, no solo rebajar la pena aplicable y permitir al sentenciado beneficiarse de la misma, sino incluso de suprimir el delito en cuestión. Eso es un ejercicio de política pública en el cual no nos podemos inmiscuir. AMPR v. Sist. Retiro Maestros IV, 190 DPR 854, 877 (2014); AAR, Ex parte, 187 DPR 835 (2013); Lozada Sánchez et al. v. JCA, 184 DPR 898, 925-926 (2012). No se trata, como argumenta la Procuradora General, que el señor Torres Cruz esté incumpliendo con la sentencia que pesa en su contra. **Se trata de que el Poder Judicial no tiene otra opción que acatar el mandato legislativo establecido por virtud de la Ley Núm. 246-2014, pues, como explicamos anteriormente, la imposición de la sentencia es un ejercicio judicial, y la sentencia siempre tiene que estar conforme con lo establecido en la legislación penal, en nuestro caso el Código Penal de 2012, según enmendado.**

Salvo que la Asamblea Legislativa disponga otra cosa mediante una cláusula de reserva, es imposible impedir, *a priori*, que una persona renuncie a invocar posteriormente los beneficios de una legislación que le es aplicable y le puede beneficiar. En otras palabras, no hay forma de impedir que la Asamblea Legislativa, retroactivamente, decida que, por virtud del principio de favorabilidad,

procede reducir la pena de una persona convicta. Si se quería evitar ese resultado, lo correcto hubiese sido oponerse al P. del S. 1210 y no esperar a que el mismo se aprobara, y se convirtiera en la Ley Núm. 246-2014, para luego oponerse a su aplicación.

V

Por los fundamentos antes expuestos, se confirma la sentencia dictada por el Tribunal de Apelaciones. En este caso, por virtud del principio de favorabilidad, procede enmendar la sentencia condenatoria que pesa en contra del Sr. Javier Torres Cruz para atemperarla a la pena de seis meses que estableció la Ley Núm. 246-2014 para el delito de escalamiento.

Se dictará sentencia de conformidad.


                                    Edgardo Rivera García
                                       Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

      v.

Javier Torres Cruz

                    CC-2015-0836   *Certiorari*

    Recurrido

**SENTENCIA**

En San Juan, Puerto Rico, a 4 de noviembre de 2015.

Por los fundamentos antes expuestos, se confirma la sentencia dictada por el Tribunal de Apelaciones. En este caso, por virtud del principio de favorabilidad, procede enmendar la sentencia condenatoria que pesa en contra del Sr. Javier Torres Cruz para atemperarla a la pena de seis meses que estableció la Ley Núm. 246-2014 para el delito de escalamiento.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado Martínez Torres emitió una Opinión de Conformidad a la que se unió el Juez Asociado señor Feliberti Cintrón. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión Concurrente a la que se unió la Jueza Presidenta señora Fiol Matta, el Juez Asociado señor Estrella Martínez y la Jueza Asociada Oronoz Rodríguez. La Jueza Asociada Oronoz Rodríguez emitió una Opinión Concurrente.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo

El Pueblo de Puerto Rico

    Peticionario

        v.                   CC-2015-0836

Javier Torres Cruz

    Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se unió el Juez Asociado señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 4 de noviembre de 2015.

Hoy se concretan los efectos nefastos de las enmiendas realizadas al Código Penal de 2012, 33 LPRA sec. 5001 et seq., mediante la aprobación de la Ley Núm. 246 de 2014. Esa acción, **puramente legislativa**, nos obliga a reducir la sentencia de una persona condenada a cumplir cuatro años por el delito de escalamiento, a una pena de solamente seis meses.

El 4 de febrero de 2013, el Sr. Javier Torres Cruz hizo una alegación preacordada mediante la cual se declaró culpable por el delito de escalamiento. Por esa declaración de culpabilidad, el Tribunal de Primera Instancia lo condenó a

cumplir cuatro años de prisión. También se le condenó a seis meses de reclusión por violación del Art. 198 del Código Penal de 2012 (daños), 33 LPRA sec. 5268, de forma concurrente. Posteriormente, mientras el señor Torres Cruz cumplía su condena, el legislador enmendó el Código Penal de 2012 para disponer que delitos, como el de escalamiento, conllevarían una pena minúscula de solo seis meses. Esas enmiendas se realizaron sin incluir una cláusula de reserva que limitara la aplicación del principio de favorabilidad. Por esa razón, el señor Torres Cruz solicitó que se redujera su sentencia a seis meses.

Según expuse en mi Opinión de conformidad en Pueblo v. Acevedo Maldonado, 2015 TSPR 81, 193 DPR ___ (2015), los efectos de penas lenientes bajo el escudo del ideal constitucional de rehabilitación tienen el efecto innegable de menospreciar a las víctimas de delito. También anticipé que con la aprobación de la Ley Núm. 246-2014, se retornaba a la visión, subyacente en el Código Penal de 2004, de que la rehabilitación solo se logra con menos tiempo de reclusión. Sin embargo, esta visión lejos de "rehabilitar" al delincuente, lo premia. Según el legislador, con la Ley Núm. 246-2014, se aprobó "una pieza legislativa de enorme trascendencia para la seguridad, la rehabilitación de los delincuentes y la lucha contra el crimen en nuestro país". Informe Comisión Conjunta para la Revisión Continua del Código Penal y la Reforma de las Leyes Penales, pág. 2. Si el legislador consideraba que esos objetivos se alcanzaban vaciando las cárceles, lo ha logrado. El resultado lo veremos pronto en nuestros vecindarios.

La Asamblea Legislativa tuvo la oportunidad de evitar el resultado al que hoy llegamos con una simple limitación al principio de favorabilidad contenido en el Art. 4 del Código Penal de 2012, 33 LPRA sec. 5004. **Sin embargo, el legislador escogió no esgrimir restricción alguna para permitir la aplicación de las nuevas penas más lenientes a <u>toda persona</u> que haya sido condenada o en proceso de serlo.** En ese sentido, la Ley Núm. 246-2014 no hizo distinción entre las sentencias elegibles para la gracia legislativa que encarna el principio de favorabilidad. Esta *omisión*, producto de la voluntad de la Asamblea Legislativa, nos lleva al resultado al que hoy llegamos. Hoy, como es nuestro deber, acatamos la ley.

Rafael L. Martínez Torres
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Pueblo de Puerto Rico | | |
| Peticionario | | |
| v. | CC-2015-0836 | |
| Javier Torres Cruz | | |
| Recurrido | | |

Opinión Concurrente emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se unen la Jueza Presidenta señora Fiol Matta, el Juez Asociado señor Estrella Martínez y la Jueza Asociada Oronoz Rodríguez

San Juan, Puerto Rico, a 4 de noviembre de 2015

Por entender que el derecho de un ciudadano convicto a invocar el principio de favorabilidad no depende de las particularidades procesales que resultaron en el dictamen condenatorio que solicita enmendar, concurro con la Opinión que hoy suscribe una mayoría de este tribunal. Sin embargo, estimo que, en atención a los argumentos categóricos esbozados por el Estado, conviene profundizar en ciertos aspectos sustantivos pertinentes a la controversia ante nuestra consideración.

Al examinar la aplicabilidad del principio de favorabilidad en el contexto de una alegación pre-acordada, resulta preciso dirimir si la avenencia de ambas figuras es incompatible en nuestro ordenamiento jurídico penal.

I

Contra el Sr. Javier Torres Cruz se presentaron acusaciones por infracciones a los artículos 195 (escalamiento agravado) y 198 (daños) del Código Penal de 2012. Iniciado el procedimiento penal en su contra, el 4 de febrero de 2013, el señor Torres Cruz renunció a su derecho a juicio por jurado e hizo una alegación de culpabilidad, mediante la cual se reclasificó el delito de escalamiento agravado a aquel tipificado en el artículo 194 del Código Penal (escalamiento). La alegación pre-acordada estuvo condicionada, además, a que se eliminara del pliego acusatorio la alegación de reincidencia habitual. Con la anuencia del Ministerio Público, el Tribunal de Primera Instancia enmendó el pliego acusatorio a esos efectos.

Efectuados los trámites de rigor concernientes a las alegaciones pre-acordadas, el Tribunal de Primera Instancia aceptó el acuerdo y, el 4 de febrero de 2013, condenó al señor Torres Cruz a un término de reclusión de cuatro (4) años por el delito de escalamiento y seis (6) meses por el delito de daños. El foro sentenciador dispuso que las penas se cumplirían concurrentemente, para un total de cuatro (4) años de reclusión.

El 21 de mayo de 2015, el señor Torres Cruz, por derecho propio, presentó una solicitud de enmienda de sentencia ante el Tribunal de Primera Instancia. En ésta, argumentó que, conforme con las disposiciones de la Ley Núm. 246 de 2014, procedía corregir la pena de cuatro (4) años que le había sido impuesta por la comisión del delito de escalamiento. Esto, puesto que la nueva ley había

reducido la pena de reclusión de este delito a seis (6) meses y, conforme con el principio de favorabilidad, correspondía enmendar la sentencia.

El 27 de mayo de 2015, el Tribunal de Primera Instancia emitió una resolución mediante la cual declaró no ha lugar la solicitud de enmienda presentada por el señor Torres Cruz. Al así proceder, determinó que la sentencia impuesta a éste se dio en virtud de un acuerdo de culpabilidad que constituía un contrato entre las partes, por lo que no procedía enmendarlo. Este dictamen, sin embargo, fue revocado por el Tribunal de Apelaciones. El foro apelativo intermedio razonó que el hecho de que la sentencia condenatoria hubiese sido dictada en virtud de una alegación de culpabilidad no exceptuaba la aplicación del principio de favorabilidad.

El Tribunal de Apelaciones señaló, además, que del acuerdo suscrito entre las partes, no surgía que el señor Torres Cruz hubiese renunciado a su derecho a invocar el referido principio. Por tanto, el Tribunal de Apelaciones enmendó la sentencia, según lo solicitado, y decretó que, de acreditarse que el señor Torres Cruz había cumplido más de seis meses de reclusión, se procediera con la expedición de un auto de excarcelación.

El 5 de octubre de 2015, compareció ante este Tribunal el Estado Libre Asociado, por conducto de la Procuradora General, mediante *Petición de certiorari y Urgente moción en auxilio de jurisdicción*. Luego de proveer ha lugar la moción en auxilio de jurisdicción, ordenamos a la Procuradora General acreditar el tiempo de reclusión cumplido por el señor Torres Cruz directamente a este Foro.

Por último, le concedimos a las partes un término de quince (15) días para exponer sus planteamientos en cuanto a la aplicación del principio de favorabilidad en el contexto de las alegaciones pre-acordadas.

El 9 de octubre de 2015, la Procuradora General compareció y acreditó a este Foro que el señor Torres Cruz había permanecido encarcelado por un periodo de dos (2) años, siete (7) meses y veintidós (22) días desde el 18 de febrero de 2013 al 28 de septiembre de 2015. En atención a ello, ese mismo día, emitimos una resolución mediante la cual expedimos el recurso de *certiorari* presentado por la Procuradora y ordenamos al Tribunal de Primera Instancia expedir el auto de excarcelación correspondiente.[4] Posteriormente, declaramos ha lugar una moción solicitando la resolución expedita del caso y que se diera por sometido éste mediante el recurso de *certiorari* presentado inicialmente.

Mediante su comparecencia, el Estado arguye que las alegaciones pre-acordadas vinculan a las partes y conllevan una renuncia a ciertos derechos de naturaleza constitucional y estatutaria, incluyendo la invocación del principio de favorabilidad. Esta contención está principalmente fundamentada por jurisprudencia federal y local que, según aduce el Estado, apunta a que, luego de la concreción de una alegación pre-acordada, lo único que puede cuestionar una persona sentenciada es lo relativo a que ésta haya sido hecha de manera libre, consciente y

---

[4] Según consta en la Resolución emitida por este Foro, la Jueza Asociada señora Pabón Charneco no intervino y el Juez Asociado señor Rivera García hubiese provisto no ha lugar.

voluntaria. Al tratarse de un acuerdo de voluntades *sui generis*, el Estado implora evaluar el mismo a la luz de la normativa que rige la contratación privada.

## II

Nuestro ordenamiento procesal penal contempla las alegaciones pre-acordadas como un vehículo útil para la pronta resolución de casos penales. En *Pueblo v. Mojica Cruz*, 115 D.P.R. 569 (1984), reconocimos la procedencia de este tipo de alegaciones y tuvimos la oportunidad de establecer las normas que regirían su tramitación. Posteriormente, mediante la Ley Núm. 37 de 28 de junio de 1985, la Legislatura incorporó lo pautado por vía jurisprudencial a las Reglas de Procedimiento Criminal.

En virtud de esta enmienda, la Regla 72 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 72, instituyó el procedimiento que debe gobernar las negociaciones entre el Ministerio Público y el imputado, así como el rol de los tribunales al momento de evaluar los acuerdos que resulten de éstas, incluyendo la discreción que ostentan los jueces para rechazar el acuerdo.[5] Asimismo, la Regla 72 contempla que el fiscal y el imputado podrán acordar que, a cambio de una "alegación de culpabilidad por el delito alegado en la acusación o denuncia o por uno de *grado inferior* o relacionado", 34 L.P.R.A. Ap. II, R. 72 (énfasis nuestro), se podrá, entre

---

[5] En cuanto al alcance de esta discreción, hemos establecido que aún si el foro de instancia acepta la alegación pre-acordada, "no está obligado a seguir las recomendaciones que le hagan las partes sobre una sentencia específica a imponerse al imputado del delito. Esto es, el tribunal tiene discreción para imponer la sentencia que entienda procedente en derecho". *Pueblo v. Dávila Delgado*, 143 D.P.R. 157 (1997).

otras cosas, eliminar una alegación de reincidencia habitual. *Véase id.*

Los beneficios que se derivan de esta práctica procesal en el ámbito penal han sido ampliamente reconocidos, tanto en nuestra jurisdicción como en la esfera federal. Éstos, no sólo comprenden la resolución expedita de controversias, lo que naturalmente redunda en el enjuiciamiento de personas acusadas de cometer delitos dentro de los términos prescritos en la Constitución y en las Reglas de Procedimiento Criminal, sino también en una descarga significativa en los calendarios de los tribunales. *Véase Pueblo v. Santiago Agricourt*, 147 D.P.R. 179 (1998). Consiguientemente, las alegaciones pre-acordadas representan un beneficio administrativo para el Estado, pues permite evitar el gasto innecesario de recursos económicos y fiscales en la dispensa de la justicia criminal. *Véase* Julio E. Fontanet Maldonado, *Plea Bargaining o alegación preacordada en los Estados Unidos: ventajas y desventajas* 118-19 (2008).

Como contrapartida, y desde el punto de vista del acusado, al aceptar un acuerdo mediante el cual formula una alegación de culpabilidad, éste renuncia a los rigores sustantivos y procesales consustanciales a un juicio plenario en lo penal; a saber, "el derecho a que se establezca su culpabilidad más allá de duda razonable; el derecho a un juicio justo, imparcial y público; el derecho a ser juzgado ante un juez o jurado, y el derecho a presentar evidencia a su favor y a rebatir la prueba presentada en su contra". *Pueblo v. Santiago Agricourt*, 147 D.P.R. 179, 192 (1998). No obstante, mediante una alegación

pre-acordada, el acusado adquiere el beneficio de destrabarse de la incertidumbre que caracteriza el proceso penal. *Véase* Fontanet Maldonado, *supra*, en la pág. 123.

Los beneficios concomitantes a este tipo de acuerdo, tanto para el Estado como para los acusados, justifican el sitial que las alegaciones pre-acordadas ocupan en nuestro ordenamiento procesal penal. Incluso, el hecho de que la propia Regla 72 de las Reglas de Procedimiento Criminal, en su inciso (6), establezca la inadmisibilidad de la existencia de una alegación pre-acordada, sus términos o condiciones, y los detalles y conversaciones conducentes a la misma en cualquier procedimiento criminal, civil o administrativo, claramente apunta a la prominencia de este tipo de acuerdos en nuestro sistema judicial. *Véase* 34 L.P.R.A. Ap. II, R. 72(6).

Con relación a la naturaleza jurídica de las alegaciones pre-acordadas, conviene puntualizar que, en repetidas ocasiones, hemos resuelto que las mismas no constituyen "ni un contrato tradicional entre el acusado y el Estado, como tampoco un precontrato de oferta u opción de alegación entre las partes donde alguna de ellas pueda exigir el cumplimiento específico en caso de incumplimiento". *Pueblo v. Santiago Agricourt*, 147 D.P.R. 179, 198 (1998). *Véase, además El Pueblo de Puerto Rico v. Figueroa García*, 129 D.P.R. 798 (1992). Sin embargo, tanto este Tribunal como los foros federales han afirmado que es posible acudir a las normas que rigen las relaciones contractuales al momento de interpretar las alegaciones pre-acordadas. Esto, siempre y cuando, al hacerlo, no se desvirtúe la naturaleza del proceso penal, o se vulneren

los derechos constitucionales de los acusados, los estatutos y la política pública protegida por el derecho procesal penal. Véanse *El Pueblo de Puerto Rico v. Figueroa García*, 129 D.P.R. 798, 806 (1992); *U.S. v. Papaleo*, 853 F.2d 16 (1er Cir. 1988).

Una peculiaridad de la concertación de una alegación pre-acordada es que la consumación del acuerdo depende, forzosamente, de la aprobación final del tribunal. A esto, entre otros elementos, se debe la atribución del calificativo *sui generis* a este tipo de acuerdo. Una vez un acusado acepta una alegación pre-acordada, la eficacia del acuerdo está sujeta a la aprobación del tribunal, ente que sirve como garante de que el acusado haya obrado de manera libre, consciente y voluntaria en sus negociaciones con el Estado.

El tribunal, por su parte, tiene la discreción de rechazar el acuerdo, al margen de las voluntades de las partes consignadas en éste. *Véase* 34 L.P.R.A. Ap. II, R.72; Olga E. Resumil de Sanfilippo, *Práctica jurídica de Puerto Rico: Derecho Procesal Penal* 127 Tomo 2 (1993)("El tribunal no queda vinculado por el mero acuerdo ya que la aceptación de la alegación estará sujeta a su discreción".) Con relación a la pena a imponerse, la propia Regla 72, contempla un acuerdo mediante el cual el fiscal y el imputado recomienden una sentencia en particular o el Ministerio Público acceda a no oponerse a la solicitud de sentencia específica que haga la defensa, estableciendo claramente que "ni lo uno ni lo otro serán obligatorios para el tribunal". 34 L.P.R.A. Ap. II, R.72. Es decir, en todos los casos en los que medie una alegación pre-

acordada, la sentencia dictada será el resultado de la discreción del tribunal y no de la voluntad de las partes.

Por tal razón, en los casos en que un tribunal acepta una alegación pre-acordada, "el acusado siempre puede hacer cualquier alegación posterior en cuanto a la sentencia que se le impuso, ya que dicha alegación no depende de que el caso se haya visto en su fondo, sino de la sentencia que le impuso el juez como parte de su alegación de culpabilidad". Fontanet Maldonado, *supra* en la pág. 81. Esto, puesto que, como mencionáramos, mediante la alegación pre-acordada, el acusado renuncia a los derechos y garantías que ordinariamente le cobijarían en un juicio penal en su fondo, mas no necesariamente a remedios procesales y sustantivos que podrían ampararlo posteriormente.[6]

Evaluados los contornos normativos y la naturaleza jurídica de las alegaciones pre-acordadas, corresponde examinar, si bien brevemente, el principio de favorabilidad y su adecuación a la controversia que nos ocupa.

## III

Como norma general, la ley penal aplicable a un imputado de un delito es aquélla vigente al momento de la comisión de los hechos. *Véase* Cód. Pen. P.R., 33 L.P.R.A. sec. 5004. A modo de excepción, sin embargo, el Artículo 4 del Código Penal consagra el principio de favorabilidad, el cual permite la aplicación retroactiva de una ley penal siempre y cuando ésta le sea más beneficiosa a un acusado. En cuanto al alcance de este principio, el Artículo 4

---

[6] Para una discusión de los remedios que pueden subsistir luego de una alegación de culpabilidad, siempre y cuando éstos no se renuncien, véase Fontanet Maldonado, *supra*, en las págs. 78-81.

dispone, en lo que atañe al recurso que nos ocupa, lo siguiente:

> La ley penal tiene efecto retroactivo en lo que favorezca a la persona imputada de delito. En consecuencia, se aplican las siguientes normas:
>
> . . .
>
> (b) Si durante el término en que la persona está cumpliendo la sentencia entra en vigor una ley más benigna en cuanto a la pena o al modo de ejecutarla, se aplicará retroactivamente.

Cód. Pen. P.R., 33 L.P.R.A. sec. 5004.

De esta manera, nuestro Código Penal contempla *expresamente* la aplicación retroactiva de una ley penal que favorezca a un imputado de delito durante el cumplimiento de su condena.[7]  Por tanto, el principio de favorabilidad opera cuando se verifica una disposición modificativa de la pena que favorece al acusado, permitiendo la adecuación de la sentencia dictada a la nueva valoración expresada por la Legislatura en el estatuto posterior.[8]  "Por tal razón, al analizar la aplicación retroactiva de una ley, hay que

---

[7] Cabe aclarar que la inclusión de una cláusula de reserva en la ley posterior, tal y como ocurrió con los Códigos Penales de 2004 y 2012, podría representar un escollo para la aplicación del principio de favorabilidad. La Ley Núm. 246 de 2014, al enmendar algunos artículos del Código Penal de 2012, prescindió de tal cláusula. *Véase* Ley Núm. 246 de 2014. Por tal razón, no es necesario abundar en la naturaleza y propósito de una cláusula de reserva. Ello, puesto que, ante la ausencia de ésta en la Ley Núm. 246, lo lógico es que nos remitamos al texto claro e inequívoco del Artículo 4 del Código Penal que consagra el principio de favorabilidad. La propia Opinión mayoritaria reconoce que "el lenguaje finalmente aprobado no contiene una cláusula de reserva, por lo que el principio de favorabilidad opera en pleno derecho". *Opinión*, en la pág. 10.

[8] En cuanto a esto, nos comenta el profesor Bascuñán Rodríguez que "[d]esde el punto de vista del principio de la proporcionalidad, también el cumplimiento de una condena resulta un exceso, cuando hay una declaración legislativa de la falta de merecimiento o necesidad de la pena que se está cumpliendo". Antonio Bascuñán Rodríguez, *La aplicación de la ley penal más favorable*, 69 Rev. Jur. U.P.R. 29, 43 (2000).

atender a la intención legislativa al aprobarla". *Pueblo v. González*, 165 D.P.R. 675, 704 (2005).

Como anticipamos, al enmendar el Código Penal de 2012 mediante la Ley Núm. 246 de 2014, la Asamblea Legislativa expresó que las enmiendas estaban dirigidas a "establecer un sistema de penas proporcionales a la severidad de los delitos", así como atender "la ausencia de proporción estructural entre las penas correspondientes a los distintos delitos". *Exposición de motivos*, Ley Núm. 246 de 2014. Con ello en mente, redujo las penas de varios delitos, según éstas se preceptuaban en el Código Penal de 2012.[9]

En cuanto al delito de escalamiento, tipificado en el Artículo 194 de ese Código, mediante la Ley Núm. 246 de 2014, se modificó su clasificación a delito menos grave, tal y como lo había sido tradicionalmente en los códigos anteriores. Tal reclasificación, supuso, a su vez, una reducción significativa de la pena, la cual pasó a ser de

---

[9]De esta manera, la *Exposición de motivos* de la Ley Núm. 246 de 2014 evidencia, sin ambages, la intención legislativa de reducir las penas. En atención a ello, resulta innecesario, para la resolución de la controversia ante nuestra consideración, realizar un "análisis exhaustivo de las personas que presentaron su ponencia ante la Asamblea Legislativa". *Opinión*, en la pág. 11. Además, nos parece incorrecto, en este caso, subsumir la postura del Poder Ejecutivo en el trámite legislativo que precedió la aprobación de la Ley Núm. 246 de 2014. Ello, ante la obvia diferencia entre el rol del Secretario de Justicia al momento de opinar en torno a asuntos de política pública ante la Asamblea Legislativa y los argumentos legales que la Procuradora General pueda esgrimir ante determinadas controversias judiciales. Esta distinción cristaliza la realidad de que el hecho de que el Secretario de Justicia se haya opuesto o no a la reducción de algunas de las penas durante el trámite legislativo no incide en la consideración de la controversia que nos atañe; a saber, la disponibilidad de un remedio que, unánimemente, este Tribunal está dispuesto a reconocer.

seis (6) meses, en lugar de los cuatro (4) años que disponía el precepto original previo a las enmiendas. Es decir, esta revaloración del delito de escalamiento, a pesar de dejar intactos los elementos de tipo estatuidos en la ley anterior, resultó en una atemperación reflexiva de la pena que éste debía acarrear.

## IV

Indisputablemente, la existencia de una alegación pre-acordada no puede incidir sobre el derecho estatutario aquí en controversia, el cual sí estaría disponible para aquéllos que se sometieron al rigor de un juicio en su fondo. Los derechos sobre los que sí incide la alegación pre-acordada atañen, como explicamos, a derechos y salvaguardas pertenecientes a la etapa de la celebración del juicio al que el acusado renunció mediante ésta. Es justamente a estos derechos y salvaguardas a los que alude la jurisprudencia federal en la que descansa el Estado para sostener sus planteamientos en este caso. Esta jurisprudencia, a su vez, se enfoca mayormente en el estado mental del acusado al momento de hacer una alegación de culpabilidad y a las circunstancias específicas que resultaron en ésta. Debido a que la contención principal del Estado es que, al aceptar una alegación pre-acordada, el acusado renuncia a invocar derechos que normalmente le cobijarían, resulta imprescindible profundizar en la jurisprudencia que se utiliza para sustentar tal proposición. Veamos.

En *Brady v. United States*, 397 U.S. 742 (1970), la Corte Suprema de los Estados Unidos tuvo ante sí un caso en el que el acusado realizó una alegación de culpabilidad por

el delito de secuestro interestatal. Luego de hacer tal alegación, el acusado solicitó el remedio de habeas corpus, alegando que su alegación había sido el resultado de coacción por parte del Estado, presión indebida de su abogado y representaciones falsas por parte de fiscalía con relación a la reducción de la pena y la posibilidad de obtener clemencia por el delito. Entre otras cosas, adujo que el texto del delito, al imponer la pena de muerte como castigo, tuvo el efecto de compelerlo indebidamente a declararse culpable con tal de evadir la posibilidad de que se le impusiera esa pena. Tanto los foros inferiores como la Corte Suprema de los Estados Unidos, determinaron en ese caso que el acusado estaba imposibilitado de ampararse en el remedio post-sentencia de habeas corpus para cuestionar su alegación de culpabilidad.

Al así concluir, se enfocaron en la voluntariedad de la alegación en sí y cómo el juez se cercioró de ésta antes de emitir su dictamen condenatorio. Fue en ese contexto en que la Corte Suprema razonó que el miedo a una condena mayor no constituye el tipo de coacción que invalide una alegación de culpabilidad por falta de voluntariedad. *Véase Brady*, 397 U.S. en la pág. 755 ("[A] plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty."). Cabe destacar que, en *Brady*, la Corte Suprema intimó que los efectos de la culminación del procedimiento penal en contra de un acusado por vía de una alegación de culpabilidad eran los mismos que aquéllos a los que se expone un acusado que se somete al juicio en su fondo. Así, afirmó que "the pleas are no more improperly compelled than is the decision by a defendant at the close

of the State's evidence at trial that he must take the stand or face certain conviction." *Id.* en la pág. 750.

En *McMann v. Richardson*, 397 U.S. 759 (1970), la Corte Suprema se enfrentó a una controversia similar a la de *Brady*. En ese caso, sin embargo, el acusado alegó que había sido objeto de coacción durante la confesión que, en última instancia lo llevó a emitir una alegación de culpabilidad. Esto, pues sabía que tal confesión sería utilizada en su contra como una admisión durante la celebración del juicio. En esencia, y acorde con lo resuelto en Brady, la Corte Suprema falló en contra del acusado, razonando que, si el acusado se hubiese sometido a los rigores del juicio, habría tenido la oportunidad de solicitar la exclusión de su admisión. Sin embargo, al declararse culpable y renunciar al juicio, el acusado renunció a ese derecho, por lo que no podía ampararse en el remedio de habeas corpus para atacar la validez de la alegación de culpabilidad. Una vez más, la Corte Suprema hizo hincapié en la voluntariedad de la alegación, esta vez al margen de la confesión previa que dio lugar a la misma.

De otra parte, en *United States v. Ruiz*, 536 U.S. 622 (2002), la Corte Suprema se expresó en torno a la renuncia a presentar prueba exculpatoria que conlleva una alegación pre-acordada. En este caso, el Estado comenzó negociaciones tendentes a lograr una alegación pre-acordada mediante la cual la acusada renunciaba a su derecho a recibir prueba exculpatoria que pudiese surgir de los testimonios de otros testigos o informantes ("material impeachment evidence), así como a prueba relacionada con defensas afirmativas que ésta podría levantar. A pesar de que el acuerdo no se

concretó, la acusada sí realizó una declaración de culpabilidad. Posteriormente, ésta solicitó una revisión de la sentencia dictada en su contra, alegando que su alegación de culpabilidad había sido involuntaria puesto que el Ministerio Público se había negado a revelar evidencia potencialmente exculpatoria. Los foros inferiores le dieron la razón, determinando que una alegación de culpabilidad no podía considerarse voluntaria si la acusada no había tenido derecho, durante las negociaciones, a recibir la evidencia exculpatoria a la que hubiese tenido derecho durante la celebración del juicio.

Al revocar, la Corte Suprema determinó que la obligación del Estado de poner a la disposición de un acusado evidencia exculpatoria se activaba una vez comenzaba el juicio, y no durante las negociaciones conducentes a lograr un acuerdo entre el Ministerio Público y el acusado. Por tal razón, la renuncia a tal evidencia en una alegación pre-acordada no anulaba la alegación de culpabilidad, pues la presentación de prueba exculpatoria era un derecho consustancial al juicio en su fondo que se preteriría mediante el acuerdo.

Finalmente, en *U.S. v. Broce*, 488 U.S. 563 (1989), la Corte Suprema también analizó la disponibilidad de un derecho que ordinariamente ampararía a un acusado durante la celebración de un juicio plenario. Esta vez, los acusados solicitaron el relevo de sus respectivas sentencias alegando que éstas constituían una violación a la prohibición constitucional de doble exposición. En esencia, los acusados se habían declarado culpables por dos cargos de conspiración. Posteriormente, alegaron que había

existido una sola conspiración y no dos, por lo que procedía, en virtud de la cláusula de doble exposición, dejar a un lado el dictamen emitido. La Corte Suprema, al rechazar su planteamiento, determinó que, al declararse culpables por dos delitos separados, los acusados conscientemente admitieron responsabilidad por dos ofensas de conspiración distintas. Además, razonó que, al declararse culpables, los acusados renunciaron a su derecho a presentar evidencia con relación a su alegación de que se trataba de una sola conspiración y no dos. Por esta razón, estaban impedidos de atacar colateralmente la sentencia dictada al amparo de la cláusula de doble exposición.

De los casos previamente reseñados, no se puede deducir, mediante el uso de la analogía, que es a lo que nos conmina el Estado, que un acusado está impedido de invocar el principio de favorabilidad luego de haber llegado a un convenio con el Ministerio Público. Como anticipamos, todos los casos discutidos se enfocan en dos aspectos de las alegaciones de culpabilidad: (1) los requisitos relacionados con el estado mental del acusado al momento de realizarlas, y (2) los derechos que tradicionalmente cobijan a un acusado *durante la celebración de un juicio*, pero que son renunciados en virtud de la alegación.

## V

Según se desprende de los hechos relatados, en el presente caso, el señor Torres Cruz acordó con el Ministerio Público hacer una alegación de culpabilidad a cambio de que se reclasificara la infracción al Artículo 195 (escalamiento agravado) y se eliminara del pliego

acusatorio la alegación de reincidencia habitual. Al aceptar tal acuerdo, el tribunal determinó condenar al señor Torres Cruz a cuatro (4) años de reclusión. Esto, luego de determinar que esa era la pena estatuida en ese momento para ese delito y que ésta habría de cumplirse concurrentemente con la pena de seis (6) meses estatuida para el delito de daños.

La Ley Núm. 246 de 2014, al reclasificar el delito de escalamiento como uno menos grave y, consiguientemente, reducir la pena correspondiente a éste, activó el principio de favorabilidad. El Estado, al permitir que el señor Torres Cruz se declarara culpable de un delito menor al originalmente imputado, accedió a que, al momento de evaluar la alegación pre-acordada y dictar sentencia, el tribunal basara su determinación en la pena dispuesta en el Código Penal de 2012 para ese delito.[10]

Los casos federales anteriormente discutidos no abordan los derechos constitucionales o estatutarios que subsisten luego de la alegación en sí. Los argumentos y planteamientos presentados por los acusados en estos casos están inherentemente relacionados con acontecimientos dentro del juicio. La presentación de prueba exculpatoria,

---

[10] En atención a esto, no es razonable que el Estado arguya que, al momento de evaluar si procede enmendar la sentencia dictada, este Tribunal tome en consideración la pena a la que el señor Torres Cruz pudo haber estado expuesto en ausencia de una alegación pre-acordada. El desacierto del Estado estriba en el hecho de que ese ejercicio valorativo **le correspondía al propio Ministerio Público al momento de efectuar las negociaciones conducentes al acuerdo y aceptarlo.** Asimismo, el tribunal sentenciador, al aceptar la alegación pre-acordada, estuvo en posición de ponderar en torno a la sentencia que hubiese podido recaer en contra del señor Torres Cruz tras la celebración de un juicio en su fondo, procedimiento al que ambas partes renunciaron mediante el acuerdo.

la invocación de la protección contra la doble exposición en un mismo procedimiento penal y la legalidad de una confesión son derechos y salvaguardas comprendidos en un juicio a los que efectivamente se renuncia mediante una alegación de culpabilidad. El Estado, sin embargo, parece pasar por alto jurisprudencia federal que apunta a la subsistencia de remedios procesales y derechos sustantivos externos a la celebración de un juicio que no radican en la validez de la alegación pre-acordada, sino más bien en los efectos posteriores que resultan del dictamen que hace un tribunal en virtud de ésta.[11]

Por último, atendiendo el argumento del Estado con relación a la naturaleza de las alegaciones pre-acordadas y cómo, al interpretar su contenido, se puede acudir por analogía a los principios que rigen el derecho contractual, es menester destacar que los intereses que tutelan ambas áreas del Derecho son inexorablemente distinguibles. Mientras que en el ámbito del Derecho Privado, la regulación de los contratos propende a la protección del tráfico jurídico, en el ámbito del Derecho Procesal Penal, las alegaciones pre-acordadas protegen el interés del Estado y de la ciudadanía de una administración justa y eficiente de la justicia que salvaguarde los derechos de todas las partes implicadas en el proceso. *Véase El Pueblo de Puerto Rico v. Figueroa García*, 129 D.P.R. 798 (1992).

En el presente caso, la aplicación del principio de favorabilidad aspira a proteger los derechos de aquellos

---

[11] *Véase Haynes v. United States*, 390 U.S. 85 (1968) (inconstitucionalidad del delito); *Tollet v. Henderson*, 411 U.S. 258 (1973) (validez del pliego acusatorio); *Jaben v. United States*, 381 U.S. 214 (1965) (prescripción del delito tras alegación de *nolo contendere*).

acusados que optan por darle fin al procedimiento penal instado en su contra por vía de un mecanismo que el propio ordenamiento jurídico fomenta. Resulta insostenible e injusto condicionar el reconocimiento de ese derecho a la naturaleza del procedimiento mediante el cual se determina la culpabilidad de un acusado. Hacer esa distinción no tendría otro efecto que el de disuadir a acusados de delitos de entrar en convenios con el Ministerio Público, lo que nuestro ordenamiento penal justamente intenta propiciar.

Por los fundamentos que anteceden, procede confirmar la sentencia dictada por el Tribunal de Apelaciones y sostener la orden de excarcelación expedida por este Tribunal.

Anabelle Rodríguez Rodríguez
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*Certiorari*

El Pueblo de Puerto Rico

    Peticionario

               v.

Javier Torres Cruz

    Recurrido

CC-2015-836

Opinión concurrente emitida por la Jueza Asociada Oronoz Rodríguez

En San Juan, Puerto Rico, a 4 de noviembre de 2015.

> Hablar del Derecho penal es hablar, de un modo u otro, de violencia. Violentos son generalmente los casos de los que se ocupa el Derecho penal (robo, asesinato, terrorismo, rebelión). Violenta es también la forma en que el Derecho penal soluciona estos casos (cárcel, internamientos psiquiátricos, suspensiones e inhabilitaciones de derecho).[12]

Estoy de acuerdo con la decisión de este Tribunal. La alegación pre-acordada por la cual el Tribunal de Primera Instancia sentenció al Sr. Javier Torres Cruz no impide la aplicación del

---

[12] F. Muñoz Conde & M. García Arán, *Derecho penal: Parte general*, 7ma ed., Valencia, Ed. Tirant lo Blanch, 2007, pág. 29.

principio de favorabilidad. Luego de que el señor Torres Cruz fuera sentenciado a una pena de reclusión de cuatro años por el delito de escalamiento, la Asamblea Legislativa enmendó el Código Penal y redujo la pena de ese delito a seis meses de reclusión. Por tanto, en virtud del principio de favorabilidad, la sentencia del señor Torres Cruz debe enmendarse para reflejar la nueva valoración de nuestro ordenamiento jurídico. Habiendo estado encarcelado en exceso de seis meses, el señor Torres Cruz debe ser excarcelado.

Sin embargo, preciso abundar en la razón de ser del cambio en política pública que redundó en una revalorización de las penas impuestas en el Código Penal de 2012. Esto, con tal de elucidar la procedencia de tal cambio como lo que es: una acción de la rama gubernamental encargada de formular, mediante legislación, la política pública que, como miembros de este Foro, estamos llamados a respetar. El cambio significativo de política pública en el ámbito penal que representó la aprobación de la Ley Núm. 246 de 26 de diciembre de 2014 (Ley Núm. 246-2014), exige profundizar en el contenido de las ponencias y la otra documentación presentada ante la Asamblea Legislativa. Indisputablemente, esta apunta a la importancia de establecer un esquema de penas cimentado en la proporcionalidad y la rehabilitación y no en la severidad y la violencia.

I

A sólo ocho años de su aprobación, el Código Penal de 2004 fue derogado por el Código Penal de 2012. Entre los cambios que esto supuso estuvo el aumento considerable en las penas, la eliminación de penas alternas a la reclusión y una menor discreción judicial al sentenciar. Este nuevo esquema de penas del Código Penal de 2012 fue criticado, entre otras razones, por la ausencia total de fundamentos empíricos y criminológicos que sustentaran su mayor severidad.[13]

Así, el 7 de octubre de 2014 se presentó en el Senado de Puerto Rico el P. del S. 1210, mediante el cual se propuso enmendar varias disposiciones del Código Penal de 2012, entre éstas el esquema de penas.[14] Las expresiones contundentes de múltiples deponentes que analizaron el proyecto establecieron la necesidad de enmendar el Código Penal de 2012 fundamentándose en que las mismas eran esenciales para lograr un sistema de penas proporcional a la severidad de los delitos.

La Dra. Dora Nevares Muñiz, quien fungió como asesora de la Comisión Conjunta para la Revisión del Código Penal y para la Reforma de las Leyes Penales en la redacción del P. del S. 1210, hizo referencia en su ponencia a diversas investigaciones criminológicas que demuestran que no existe una relación entre el aumento en la severidad de las penas y la reducción de la actividad delictiva. Por el contrario, "[l]o que los estudios empíricos demuestran es

---

[13] Comisión Conjunta para la Revisión del Código Penal y para la Reforma de las Leyes Penales, *Informe positivo sobre el P. del S. 1210*, págs. 81-82.
[14] Concurrentemente se presentó en la Cámara de Representantes el P. de la C. 2155, igual en contenido.

que, invertir recursos en aumentar la probabilidad de detección del crimen y la aprehensión de los criminales es considerablemente más efectivo en reducir la criminalidad, que invertir recursos en aumentar el tiempo que el convicto pasará encarcelado".[15]

Estableció, además, que:

> La aprobación [del] Código Penal de 2012 de forma apresurada sin considerar su interacción con las leyes penales especiales generó duplicidad de delitos y disparidad de penas entre el propio Código y las leyes especiales: además de la resultante ausencia de proporción estructural entre las penas correspondientes a los distintos delitos.[16]

Asimismo, añadió que el P. del S. 1210 era un paso de avance hacia "[u]n Código Penal justo y claro, comprensible, [que] en su aplicación facilita tanto la prevención como el control del crimen una vez ocurre".[17]

Por su parte, el profesor Luis E. Chiesa, quien también fungió como asesor en la redacción del P. del S. 1210, expandió sobre la incongruencia de las penas en el Código Penal de 2012 al indicar que:

> La razón principal por la cual es necesario enmendar sustancialmente el CP 2012 es que éste carece de un hilo conductor que justifique tanto su esquema de penas como las doctrinas de la parte general y las definiciones de los delitos en particular que ahí se codifican. En cuanto al esquema de penas, la premisa inarticulada que dio lugar a la adopción del CP 2012 es que la criminalidad se puede combatir eficientemente mediante un aumento considerable en las penas. Desafortunadamente [...] esta premisa es demostrablemente falsa.[18]

---

[15] Dora Nevares Muñiz, *Ponencia sobre los P. del S. 1210 y P. de la C. 2155*, pág. 5, disponible en: http://www.oslpr.org/2013-2016/ponencias/A35ZPNWJ.pdf (última visita, 29 de octubre de 2015).
[16] Id., pág. 3.
[17] Id., pág. 52.
[18] Luis E. Chiesa, *Comentarios al P. del S. 1210, P. de la C. 2155*, págs. 1-2, disponible en: http://www.oslpr.org/2013-2016/ponencias/A35ZPJ7I.pdf (última visita, 29 de octubre de 2015).

El profesor Chiesa presentó, además, un análisis comparativo en el que consideró la pena máxima del Código Penal de 2012 para ciertos delitos y la contrastó con la pena máxima que para esos mismos delitos establecían otras jurisdicciones, como Nueva York, California o España.[19] En todos los casos las penas del Código Penal de 2012 resultaron significativamente más altas.

No cabe duda que el objetivo de la Asamblea Legislativa fue corregir la desproporción de las penas y otros defectos del Código Penal de 2012. Las enmiendas realizadas buscaban "armonizar la búsqueda de la paz social con los derechos de las víctimas y de los acusados dentro de un sistema constitucional que mandata la rehabilitación del confinado".[20] Así, no cabe hablar del "*ideal* constitucional de rehabilitación"[21] cuando existe un mandato contundente e inequívoco a garantizar la misma.

Culminado el trámite de discusión y enmiendas, el P. del S. 1210 fue aprobado y se convirtió en la Ley Núm. 246-2014. Según la Exposición de Motivos de dicha Ley, ésta enmendó el esquema de penas del Código Penal de 2012 para erigir un sistema de penas más proporcional a la

---

[19] Id. Los delitos comparados fueron violación, incesto, robo simple, robo agravado y apropiación ilegal agravada. En el caso de violación la pena máxima en Puerto Rico era 62.5 años, en Nueva York 25 años, en California 13 años, en España 12 años y en Alemania 10 años. Para el delito de incesto la pena máxima en Puerto Rico era 62.5 años, en Nueva York 25 años, en California 3 años, en España 0 años y en Alemania 3 años. Para robo simple la pena máxima en Puerto Rico era 25 años, en Nueva York 7 años, en California 5 años, en España 3 años y en Alemania 5 años. En el caso de robo agravado la pena máxima en Puerto Rico era 37.5 años, mientras que en Nueva York era 25 años, en California 9 años, en España 5 años y en Alemania 10 años. Para el delito de apropiación ilegal agravada la pena máxima en Puerto Rico era 18.5 años, en Nueva York 7 años, en California 3 años, en España 6 años y en Alemania 10 años. Se debe aclarar que por modificaciones que se hicieron durante el trámite de aprobación legislativa, algunas de esas penas, como la del delito de incesto, así como varias modalidades del delito de violación, no fueron objeto de enmienda.

[20] Comisión Conjunta para la Revisión del Código Penal y para la Reforma de las Leyes Penales, supra, nota 1, pág. 3.

[21] Véase la Opinión de Conformidad emitida por el Juez Asociado señor Martínez Torres (énfasis suplido).

gravedad de los delitos, extender la viabilidad de sanciones alternas a la reclusión en los delitos de severidad intermedia y conceder un mayor margen de discreción al juez para determinar, dentro de ciertos límites, la pena adecuada para el convicto.[22]

El legislador no incluyó en la Ley una cláusula de reserva que impidiera la aplicación de sus disposiciones más favorables a los delitos cometidos con anterioridad a su aprobación. Por el contrario, en un ejercicio de discreción deliberado hizo lo que estuvo a su alcance para establecer una política pública que favoreciera la proporcionalidad de la pena, incluyendo su aplicación retroactiva a personas que cometieron delitos con posterioridad a la aprobación del Código Penal de 2012.[23]

Al no incorporar una cláusula de reserva la Asamblea Legislativa viabilizó la aplicabilidad del principio de favorabilidad y permitió extenderlo retroactivamente al nuevo esquema de penas. Con ello, promovió la rehabilitación social y moral de las personas convictas.

Surge de la Exposición de Motivos que la aprobación de la Ley Núm. 246-2014 respondió a una determinación de política pública por parte del legislador para reformar nuestro sistema de justicia criminal, consciente de que el

---

[22] Exposición de Motivos de la Ley Núm. 246 de 26 de diciembre de 2014 (2014 Leyes de Puerto Rico 2385-2386).
[23] Tal y como expresé recientemente, citando a la Dra. Nevares Muñiz, la Ley Núm. 246-2014:

> [N]o contiene una cláusula de reserva que prohíba su aplicación retroactiva. [citas omitidas] Ello porque mediante dicha ley la legislatura tuvo la intención de 'disponer penas rehabilitadoras en delitos menos graves y en delitos graves de severidad intermedia; además de disponer para el ejercicio de la discreción judicial mediante criterios que orienten al ejercerla.'" Pueblo v. Cordero Meléndez, 2015 TSPR 123, pág. 11 (Op. de Conformidad, J. Oronoz Rodríguez)

esquema de penas establecido en el Código Penal de 2012 resultaba altamente punitivo sin que hubiera justificación para ello. En cambio, durante el proceso de elaboración del P. del S. 1210 se recibió el insumo de literatura, estudios, estadísticas y otra evidencia empírica que demostró el rechazo unánime de los expertos a la noción de que la imposición de penas más severas propicie la disminución en la actividad criminal.

Sobre este particular, debe quedar claro que a la luz de los entendidos modernos en la Criminología, la Ley Núm. 246-2014 propuso que la relación entre la severidad del castigo y la gravedad del delito fuera más proporcional. Debía tener en cuenta a todas las partes involucradas y adelantar de una manera más objetiva los fines que el propio Código Penal de 2012 reconoció para la pena: la prevención del delito, la justicia para las víctimas, el castigo justo y proporcional para el ofensor, y la rehabilitación del convicto.[24]

Asimismo, el reconocimiento de que la pena de reclusión es la sanción que más relación guarda con una eventual reincidencia influyó en la política pública que persigue la Ley Núm. 246-2014.[25] En particular, al adoptar penas alternas a la reclusión como la restricción terapéutica, la Asamblea Legislativa reconoció que la adicción es una enfermedad y que al adicto que delinque se le debe fijar una sanción que promueva su recuperación. Asimismo, la Asamblea Legislativa estimó crucial reconocer y validar la discreción de los jueces y las juezas por lo

---

[24] Art. 11 del Código Penal de 2012, 33 LPRA sec.5011.
[25] Nevares Muñiz, supra, nota 3, págs. 4-5.

que adoptó esta política pública que propicia que las sentencias puedan ajustarse a las peculiaridades del caso.[26]

II

Estas medidas nos sitúan en una coyuntura similar a la que se vive en los Estados Unidos. Allí, la política pública para atender la criminalidad ha comenzado a cambiar después de décadas de una política criminal fallida de mano dura y sobrecriminalización que vio cómo a pesar de la tipificación de mayores delitos, penas más severas, cárceles llenas y miles de millones de dólares invertidos para mantener el aparato de justicia criminal, las tasas de actividad delictiva seguían a niveles muy altos.[27] Así, durante los últimos años la política pública a nivel estatal y federal ha ido dirigida a fomentar la reinserción de la persona convicta, reducir las tasas de encarcelamiento y el costo de la prisión para el erario y promover las penas alternas a la reclusión.[28]

---

[26] Exposición de Motivos de la Ley Núm. 246 de 26 de diciembre de 2014 (2014 Leyes de Puerto Rico 2385-2386).

[27] Desde 1980 hasta el presente, el número de adultos encarcelados en los Estados Unidos ha aumentado de medio millón a más de 2.3 millones, lo que significa que uno entre cada cien adultos está preso. Este incremento ha convertido a ese país en el de mayor número de presos per cápita en el mundo. Véase, Institute for Criminal Policy Research, *World Prison Brief*, disponible en: http://prisonstudies.org/country/united-states-america (última visita, 31 de octubre de 2015); John Malcolm, *Criminal Justice Reform*, The Heritage Foundation, (24 de Julio de 2015), disponible en: http://www.heritage.org/research/testimony/2015/criminal-justice-reform (última visita, 31 de octubre de 2015). Véase también, William J. Stuntz, *The Collapse of American Criminal Justice*, Harvard Belknap, 2011, pág. 275.

[28] Ram Subramanian, Rebecka Moreno & Sharyn Broomhead, *Recalibrating Justice: A Review of 2013 State Sentencing and Corrections Trends.* Vera Institute of Justice, 2014, disponible en: http://www.vera.org/sites/default/files/resources/downloads/state-sentencing-and-corrections-trends-2013-v2.pdf (última visita, 29 de octubre de 2015); U.S. Dept. of Justice, *Smart on Crime, Reforming the Criminal Justice System for the 21st Century*, disponible en: http://www.justice.gov/sites/default/files/ag/legacy/2013/08/12/smart-on-crime.pdf (última visita, 31 de octubre de 2015).

La necesidad de reformar el sistema de justicia criminal en los Estados Unidos es tan apremiante que, en un país donde generalmente el debate político está muy polarizado, ha surgido un consenso que trasciende ideologías y partidos políticos.[29] Por ejemplo, organizaciones progresistas -como el American Civil Liberties Union (ACLU) o el Center for American Progress- y conservadoras -como el Heritage Foundation, el Cato Institute o el Federalist Society- han abogado enérgicamente por un cambio drástico en la política pública para controlar el uso excesivo del poder punitivo del Estado, tema que han adoptado como parte integral de sus respectivos programas.[30] Una muestra de ello es el U.S. Justice Action Network, organización compuesta, entre otros, por la ACLU y por grupos conservadores como el Right on Crime, el Faith & Freedom Coalition o FreedomWorks y que se dedica a promover legislación para eliminar la sobrecriminalización, reducir la población penitenciaria y facilitar el proceso de reintegración de la persona convicta.[31]

Como ha sido constatado reiteradamente en la literatura especializada, la sobrecriminalización también

---

[29] Zach Dillionns, *Symposium on Overcriminalization: Foreword*, 102 J. Crim. L. & Criminology 525 (2012); Norman L. Reimer, *Opening Remarks*, 7 J.L. Econ. & Pol'y 573, 573-574 (2011).

[30] *Criminal Justice is so Broken, Democrats and Republicans are working together to fix it*, PBS Newshour, (30 de abril de 2015), disponible en: http://www.pbs.org/newshour/bb/criminal-justice-broken-democrats-republicans-working-together-fix/ (última visita, 31 de octubre de 2015); Adam Liptak, *Right and Left Join Forces on Criminal Justice*, The N.Y. Times, (23 de noviembre de 2009), disponible en: http://www.nytimes.com/2009/11/24/us/24crime.html?_r=0 (última visita, 31 de octubre de 2015); John Malcolm, supra, nota 8.

[31] *Leading Advocates on the Left and the Right Join Forces for New Justice Reform Organization in Ohio*, American Civil Liberties Union (ACLU) of Ohio, (16 de julio de 2015), disponible en: http://www.acluohio.org/archives/press-releases/new-justice-reform-organization-in-ohio (última visita, 31 de octubre de 2015).

tiene sus víctimas.[32] Por diversas razones de índole social, político, económico y cultural, los grupos y las comunidades con menos recursos económicos son las más afectadas por las políticas criminales punitivas y expansivas.[33] Un dato puede bastar, el 37.7% de los confinados en las cárceles federales de los Estados Unidos son de raza negra y otro 34% son hispanos, lo que en conjunto representa aproximadamente el 71% de toda la población penitenciaria de ese sistema.[34]

Además de afectar al confinado que ve coartada su rehabilitación, las consecuencias de la encarcelación masiva se extienden a la familia, quienes no sólo se ven privados de la presencia de un padre, madre, hijo, hermano o cónyuge, sino además del sustento económico que éste aporta al hogar. En muchas ocasiones esto desata un ciclo sin salida de mayor pobreza, marginación y encarcelamiento.[35] De la misma manera, la comunidad se afecta al no poder contar con la capacidad productiva de uno de sus miembros, quien, además, al reinsertarse después de cumplir la sentencia puede enfrentar una gran dificultad para encontrar empleo debido al estigma asociado a la condición de exconvicto.[36]

---

[32] Michelle Alexander, *The New Jim Crow*, New York, The New Press, 2010, pág. 7; David Cole, *No Equal Justice: Race and Class in the American Criminal Justice System*, New York, The New Press, 1999, pág. 5; Erik Luna, *The Overcriminalization Phenomenon*, 54 Am. U. L. Rev. 703, 726-727 (2005).

[33] David Cole, supra, nota 9, pág. 5.

[34] Federal Bureau of Prisons, *Statistics*, disponible en: http://www.bop.gov/about/statistics/statistics_inmate_race.jsp (última visita, 31 de octubre de 2015).

[35] Michelle Alexander, supra, nota 9, pág. 7; Donysha Smith, *Building a Prison-to-Purpose Pipeline for Women*, OPEN SOCIETY FOUNDATIONS, (9 de octubre de 2015), disponible en: https://www.opensocietyfoundations.org/voices/building-prison-purpose-pipeline-women? (última visita, 29 de octubre de 2015).

[36] John Malcolm, supra, nota 8; Ari Melber, Obama bans the box, MSNBC, (3 de noviembre de 2015), disponible en:

III

Al traer al centro de la política pública del Estado el requisito de proporcionalidad entre la gravedad del delito y la severidad de la pena, el esquema de penas adoptado –que en el presente caso ha resultado en la excarcelación del señor Torres Cruz– valora la dignidad humana de la persona convicta y promueve su rehabilitación, tal y como lo exige la Constitución. No se trata de ser *fuerte* o *débil* contra el crimen. Se trata de reconocer la complejidad de la situación para adelantar una política criminal informada que sea *efectiva*.

Así pues, la Ley Núm. 246-2014 representa un esfuerzo necesario para que nuestro ordenamiento jurídico se encamine a solucionar los problemas que plantea la conducta delictiva de una forma responsable, sensible y menos violenta, centrado en el imperativo constitucional de la rehabilitación.

Maite D. Oronoz Rodríguez
Jueza Asociada

---

https://www.msnbc.com/msnbc/obama-bans-the-box (última visita, 4 de noviembre de 2015).